## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| MARY C. EASTRIDGE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 11-CV-3105 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

Plaintiff Mary C. Eastridge appeals from the denial of her application for Supplemental Security Income ( "Disability Benefits") under the Social Security Act.  42 U.S.C. § 1381a, and 1382c.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  Eastridge has filed a Brief in Support of Motion for Summary Judgment (d/e 17) (Motion for Summary Judgment), and Defendant Commissioner of Social Security has filed a Motion for Summary Affirmance (d/e 19) (Motion for Summary Affirmance).[1]  The parties consented, pursuant to 28 U.S.C. § 636(c), to have this matter proceed before this Court.  <u>Consent to Proceed Before a United States Magistrate Judge, and Order of Reference entered</u>

---

[1]Eastridge has not filed a motion for summary judgment as required by the Local Rules.  <u>Local Rule</u> 8.1(D).  The Court deems the brief filed by the Eastridge (d/e 17) to be a motion for summary judgment.

September 15, 2011 (d/e 15).  For the reasons set forth below, the

Decision of the Commissioner is affirmed.

STATEMENT OF FACTS

Eastridge was born on November 17, 1959.  R. 25.  Eastridge

graduated from high school.  Answer to Complaint (d/e 13),attached

Certified Transcript of Record of Proceedings Before the Social Security

Administration (R.) 26.  She has no significant work history.  She suffers

from back and joint pain.[2]  On June 2, 2006, Eastridge underwent an MRI

of her lumbar spine.  The test showed multilevel canal narrowing including

degenerative facet ligamentum flavum hypertrophy associated with dural

sac narrowing which appeared to be moderate at L3-L4 with milder dural

sac stenosis at L4-L5, slight degenerative anterolisthesis of L4 and L5, and

degenerative facet arthropathy.  At T11-T12 and T12-L1, there was disc

protrusions and mild dural sac narrowing.  R. 490-91.  On June 23, 2006,

Eastridge saw Dr. Philip C. Wilson, M.D., with complaints of numbness in

her legs and aching in her elbows.  On examination, Dr. Wilson found that

Eastridge's gait and stance were normal.  Dr. Wilson stated that the MRI

_____

[2]Eastridge also allegedly suffered from limited intelligence, some mental
problems, diabetes, hepatitis C, and some esophageal problems.  Eastridge does not
raise any issues on appeal related to anything other than her back and other
musculoskeletal problems.  The Court therefore does not discuss the evidence or
analysis of the other conditions.

showed significant spinal stenosis at multiple levels.  R. 471.  He diagnosed her with hypertension and spinal stenosis of the back.  R. 471.

Eastridge looked for work through the Illinois Department of Human Services, Division of Rehabilitation Services (DRS).  R. 43.  On July 5, 2006, DRS issued a Closure Notification of a case file for Eastridge.  The Closure Notification stated that as of August 9, 2006, Eastridge's case file would be closed because, "Your disabilities prevent you from working in a position that would meet your needs".  R. 467.

On September 25, 2006, Dr. Frank Jimenez, M.D., reviewed the medical record and performed a Residual Functional Capacity Assessment.  R. 567-74.  Dr. Jimenez opined that Eastridge could lift, carry, push, and pull ten pounds occasionally and less than ten pounds frequently, and could stand and/or walk at least two hours and sit about six hours in an eight-hour day.  R. 568.  Dr. Jimenez opined that Eastridge should never climb ladders, ropes or scaffolds; could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or crawl; and should avoid concentrated exposure to extreme cold, heat, wetness, humidity, vibration, and hazards.  R. 569-71.  Dr. Jimenez stated that he considered Dr. Wilson's finding of significant spinal stenosis at multiple levels.  R. 574.

On October 13, 2006, Eastridge saw Julie Barry, a certified nurse practitioner associated with Dr. Wilson.  R. 582.  Eastridge reported diffuse

pain in multiple areas, but most significantly in her lower back and legs. She denied any numbness. Barry found that Eastridge had limited range of motion in her neck; crepitation in her knees and elbows; limited back and forward movement in her back; satisfactory lateral movement in her back; full range of motions in her arms; and no joint redness, edema, or warmth. Barry diagnosed spinal stenosis and osteoarthritis. Barry provided Eastridge with a supply of Celebrex for pain. R. 582.

On November 21, 2006, Eastridge saw Barry. Eastridge reported that since she started taking Celebrex she had only one episode of pain, which occurred after physical activity. R. 580. Barry found limited range of motion in Eastridge's back, but full range of motion in her arms with no swelling in any joints. R. 580. Barry referred Eastridge to a neurosurgeon.

On November 28, 2006, Barry completed a form for a state agency. Barry noted diagnoses of osteoarthritis and spinal stenosis. She noted low back pain radiating to the hips, diffuse pain elsewhere and stiffness; numbness in the lower legs that increased with activity; minimal lumbar tenderness; upright and guarded posture; limited neck and back range of motion; no evidence of nerve-root compression; and normal ambulation and gait. R. 590. Barry opined that Eastridge must alternate between sitting and standing every ten to fifteen minutes. R. 591.

On March 22, 2007, Eastridge saw Dr. Sunil Chauhan, M.D., a neurologist, for treatment of back pain. R. 719. Dr. Chauhan found that Eastridge had pain with a straight leg raising test, normal strength and reflexes, intact sensation, no swelling, and normal gait. R. 720. Dr. Chauhan reviewed the June 2006 MRI and noted some degenerative changes in the lower back, but otherwise no impingement of the spinal cord. R. 720. Dr. Chauhan recommended regular physical activity and prescribed physical therapy. R. 720.

Eastridge saw Dr. Chauhan again on March 12, 2008. Dr. Chauhan noted some pain in the left leg on straight leg raising, but no pain in the right. Dr. Chauhan also observed normal strength and gait, motor and sensory function. R. 767. Dr. Chauhan diagnosed chronic back pain, most likely lumbosacral radiculopathy. R. 767-68. Dr. Chauhan noted that Eastridge had extensive degenerative lower back disease but no evidence of spinal cord compressions. R. 767. Dr. Chauhan noted that Eastridge's condition was stable. R. 768.

## THE INITIAL HEARING

The Administrative Law Judge conducted a hearing on March 27, 2008. Eastridge appeared with counsel. John F. McGowan, Ed.D., also appeared as a vocational expert. R. 20-67. Eastridge testified that she lived alone in an apartment in Quincy, Illinois. Eastridge did not drive

because she lost her license in 1985 due to a felony DUI. R. 25. Eastridge graduated high school and had some training at a beauty school. R. 26. She also started college, but stopped shortly after beginning. R. 27.

She last worked as a personal assistant for a neighbor. She worked three hours a day. She stayed at the job for about three months. Before that, she worked for a telemarketing company for about three months. R. 26-27. She also worked at a factory briefly right after finishing high school in 1978 and 1979. R. 28.

Eastridge was taking Celebrex, Ultram, and Skelaxin for pain. R. 28-29. The medication upset her stomach so she also took Prevacid. R. 29. Eastridge testified that she felt pain in her upper back like a numbness and a burning from her waist down in her back. R. 45. Her hips and legs ached down to the knee on the left side and down to the heel on the right. R. 46. Eastridge testified that she felt this type of pain two to three times a week. R. 46.

Eastridge testified that she usually got up in the morning at about 5:30 a.m. and went to bed at 10:30 p.m. R. 30. During the day, she went across the street to visit with a neighbor two or three times a week. R. 32, 54. She also watched TV and listened to the radio. R. 36.

She went to the library to rent movies about once a week. R. 32. She either walked to the library or took the bus. R. 31. Eastridge's

residence was twelve blocks from the library. Eastridge testified that she had to stop a couple of times to rest during a walk to the library. R. 31.

Eastridge went to church regularly, about four times a week, for worship, ladies group meeting, and Bible study. R. 33. She took the bus to church. R. 34. She sang occasionally at church and helped with the clothing ministry. R. 34. The church meetings usually lasted about two hours. Eastridge testified that she became uncomfortable sitting for that length of time and sometimes had to get up and move around. R. 55.

Eastridge did her own grocery shopping. She testified that she leaned on the cart while shopping. She testified that shopping took about an hour from the time she left home until she returned. R. 53-54.

Eastridge did her own household chores including cooking, cleaning, and laundry. R. 32. She testified that she put off sweeping and mopping as long as possible because of the pain. R. 47, 53. She also testified that bending over caused pain. R. 47. She testified that she hurt her back the day before the hearing when she stood for about an hour and a half ironing. R. 36. She testified that she only washed a few clothes at a time. She also took breaks while doing dishes. She would wash a sink load of dishes and then take a break, and then wash another sink load. R. 54.

Eastridge testified that she could stand for an hour and a half before her back would start hurting, she could sit for half an hour, and walk six

blocks.  R. 36-37.  Eastridge testified that a gallon of milk was the heaviest thing that she could lift.  R. 35.  She testified that her hands and fingers sometimes went numb.  R. 41.  She testified that she could take care of her personal hygiene and personal needs, such as dressing and bathing. R. 40.

Eastridge testified that she looked for work through DRS, but they could not find her a job.  R. 43.  Eastridge counsel noted that DRS made a determination that her disabilities prevented her from working in a position that would meet her needs.  R. 43.

Eastridge testified that she had pain in one ankle because she fractured it recently.  R. 47.  Her ankle still swelled some at the time of the hearing.  The ankle also hurt when the weather changed.  R. 47.  Eastridge also had occasional fleeting ringing in her ears and dizziness.  R. 48.

Eastridge testified that she had problems with stiffness in her neck. R. 48.  She stated that the stiffness went into her shoulders.  She had difficulty turning her head to the left or right.  R. 49.  She testified that her neck and shoulders hurt two to three times a week.  R. 49.  She said that washing her hair caused pain because of how she had to lift her hands to her head.  R. 49.

Eastridge testified that she had trouble with her elbows, wrists, and feet.  She said that her left elbow swelled.  She said that she had shooting,

stabbing pain in her wrists.  She had the pain in both wrists, but more on the left side.  R. 50.  Eastridge testified that she had numbness and burning in her feet.  R. 52.  She said that sometimes her feet would go numb at church if she stood for thirty minutes.  R. 53.  At least once, the numbness traveled up to her ankle after she stood for an hour.  R. 52-53.  She testified that it took two hours before she could feel her feet again.  R. 53.

Eastridge testified that she had trouble sleeping.  She woke up every hour and a half.  She was usually sweating when she woke up.  R. 49.  She said that she had trouble sleeping three to four times a week.  R. 50.

Vocational expert Dr. McGowan then testified.  Dr. McGowan testified that Eastridge had no past relevant work.  R. 57.  The ALJ then asked Dr. McGowan:

> [A]ssume that a hypothetical individual with Ms. Eastridge's age, education, and work experience would be limited to work that –. . .
> . . . .
> . . . frequently lift 10; occasionally lift 10.  The person could stand less than six hours out of an eight-hour work day, at least two to four, I would say, with normal breaks – four being, probably, the absolute max; sit at least six out of an eight-hour work day; pushing and pulling limited to no greater than 10 pounds; should avoid climbing, generally – certainly ladders, ropes, and scaffolds, and working at height, and unprotected dangerous machinery, and unprotected heights; occasional balancing; avoid stooping; and, occasional crouching.

R. 57-58.  The ALJ added that, "handling, fingering, and feeling are unlimited" and "Person should avoid extremes of temperature" and "high

humidity." R. 58, 59.  The ALJ then asked, "Well, with those limitations, would there be work that a person could perform?"  R. 60.

Dr. McGowan opined that such a person could perform "unskilled, direct entry jobs within the sedentary area."  R. 61.  Dr. McGowan opined that a person with those limitations could work as an information clerk, electronic assembly and semiconductor die assembly.  R. 61-62.

After Dr. McGowan testified, the ALJ told Eastridge that he may send her to see some doctors at the government's expense for further examination.  R. 66.  The ALJ then concluded the hearing.  R. 67.

<u>POST HEARING EXAMINATION</u>

On May 17, 2008, Dr. Raymond Leung, M.D., performed a consultative examination of Eastridge.  R. 752-64.  Dr. Leung found that Eastridge had a full range of motion except in the low back with extension limited to five degrees.  Dr. Leung also found no spasms, a normal gait, normal strength, normal sensation and reflexes, and no swelling. Dr. Leung stated that Eastridge was able to manipulate a small object with her hands fairly well.  R. 754.  Dr. Leung opined that Eastridge could lift and carry up to twenty pounds occasionally and up to ten pounds frequently, stand for four hours in an eight-hour day, walk for two hours in an eight-hour day, and sit eight hours in an eight-hour day.  R. 759-60. Dr. Leung opined that Eastridge could frequently use her hand for

reaching, handling, fingering, feeling, pushing, and pulling; frequently use her feet to operate foot controls; and frequently balance. Dr. Leung opined that Eastridge could occasionally climb ladders, scaffolds, ramps, and stairs; occasionally stoop, kneel, crouch, and crawl; occasionally tolerate unprotected heights, moving mechanical parts, and operate a motor vehicle; and continuously tolerate extreme cold, heat, wetness, humidity, and vibration. R. 760-63.

## THE FIRST DECISION OF THE ALJ

The ALJ issued his initial decision on August 4, 2008. R. 137-145. The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis). 20 C.F.R. §§ 404.1520, 416.920. Step 1 requires that the claimant not be currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If true, Step 2 requires the claimant to have a severe impairment. 20 C.F.R. §§ 404.1520(c), 416.920(c). If true, Step 3 requires a determination of whether the claimant is so severely impaired that she is disabled regardless of the claimant's age, education and work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant's condition or combination of conditions must meet the criteria for one of the conditions set forth in the Listings or be equal to the criteria in one of the Listings. 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not so severely impaired, then Step 4 requires the claimant not to be able to return to her prior work considering his Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant cannot return to her prior work, then Step 5 requires a determination of whether the claimant is disabled considering her RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(f), 416.920(f).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005); Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995).

The ALJ found that Eastridge met her burden at Steps 1 and 2.  She was not engaged in substantial gainful activity since June 23, 2006, the alleged onset date of her disability, and that she suffered from severe impairments from degenerative disc disease of the lumbosacral spine, status-post left ankle fracture, and low average intelligence.  R. 138, 143.

At Step 3, the ALJ found that none of Eastridge's conditions or combination of conditions equaled a Listing. R. 139, 143.   The ALJ relied on the treatment notes from Dr. Chauhan and Dr. Leung's examination.

The ALJ relied Dr. Chauhan's finding of no spinal cord impingement and recommendation of pain medication and physical therapy to support his conclusion that her condition did not meet a Listing.  R. 140.  The ALJ also relied on Dr. Leung opinions regarding Eastridge's exertional limitations to support his conclusion.  R. 140.  The ALJ acknowledged Dr. Wilson's diagnosis of significant spinal stenosis and Barry's opinion that Eastridge could sit or stand for only ten to fifteen minutes, but concluded that the evidence from Drs. Chauhan and Leung was more persuasive.  R. 139-40.

At Step 4, the ALJ found that Eastridge had the RFC to perform sedentary work limited to simple, repetitive tasks.  R. 140.  The ALJ proceeded to Step 5 since Eastridge did not have any relevant past work.  At Step 5, the ALJ relied on Dr. McGowan's opinions to determine that Eastridge could perform a substantial number of jobs in the national economy.  R. 141.

The ALJ acknowledged that Eastridge described symptoms to Dr. Wilson and Barry to which she testified at the hearing.  The ALJ, however, found that the opinions of Dr. Chauhan outweighed the opinions of Dr. Wilson and Barry.  R. 141.

The ALJ further found that Eastridge's claims of pain were not credible.  The ALJ found that Eastridge did not have signs typically associated with chronic severe musculoskeletal pain, such as muscle

atrophy, persistent muscle spasms, and neurological deficits. R. 142.  The ALJ further found Eastridge's claims of limitations on her abilities due to pain to be inconsistent with the medical evidence.  R. 142.  The ALJ also discounted the DRS statement that Eastridge was not suitably employable because the statements were not medical opinions and such agencies, "only accept persons who seem willing to make the effort to succeed . . . and will not goad someone who insists that she is not physically able to make such an effort."  R. 142.

The ALJ acknowledged that Eastridge's counsel asked for a supplemental hearing in which he could examine Dr. Leung.[3]  The ALJ told counsel to first submit written interrogatories, but counsel did not do so. R. 143.  The ALJ, therefore, did not hold a supplemental hearing.  Based on the ALJ's, findings, the ALJ determined that Eastridge was not disabled. Eastridge appealed the decision to the Appeals Council.

<u>POST INITIAL DECISION MEDICAL EVIDENCE</u>

Eastridge went to see Dr. Wilson again on November 4, 2008. R. 825.  Eastridge reported increased muscle cramping and also complained of hand cramping.  R. 825.  Dr. Wilson found no tenderness and full range of motion and equal strength in all extremities.  R. 825.

---

[3]Eastridge also asked to examine psychologist Dr. Froman, Ed.D., at the supplemental hearing.  After the hearing, Dr. Froman provided a Consultative Psychological Evaluation Report dated April 22, 2008.  R. 745-51.

Eastridge saw Dr. Wilson again on January 6, 2009. Dr. Wilson found no tenderness in her joints and full range of motion and equal strength in her upper extremities. R. 823. Eastridge next saw Dr. Wilson on April 7, 2009. R. 821. Dr. Wilson found no tenderness in the low back and buttock region, minimal tenderness to manipulation in the right knee, a somewhat mobile right kneecap, a small amount soft swelling lateral to the patella, and no redness. R. 821. On July 9, 2009, radiological tests showed degenerative disc disease in the low back without acute fracture, endplate osteophytes at multiple levels, and Grade I anterolisthesis of L3 on L4 and L4 on L5. R. 830.

THE DECISION OF THE APPEALS COUNCIL

On April 10, 2009, the Appeals Council vacated the ALJ's decision and remanded the case for further proceedings. The Appeals Council stated that the ALJ secured post hearing reports from Dr. Leung and Dr. Froman and forwarded them to Eastridge's attorney. The ALJ indicated in the cover letter that if Eastridge wanted a supplemental hearing, she first needed to state why the hearing was necessary and state the questions that she would pose to the consultative examiners. R. 147. Eastridge's counsel did not respond. The Appeals Council stated that the ALJ was required to grant the requested supplemental hearing under the circumstances of this case. R. 147. The Appeals Council also held that

the ALJ should have secured a medical expert to resolve the apparent conflict between Dr. Wilson and Dr. Chauhan's interpretation of the June 2006 MRI of Eastridge's lumbar spine.  R. 148.

The Appeals Council remanded the case with instructions to secure evidence from a medical expert to clarify the nature and severity of Eastridge's impairments and to clarify the conflicting interpretations of the June 2006 MRI; further consider Eastridge's RFC and give appropriate rationale and specific references to the record to support the ALJ's assessment; secure additional evidence from a vocational expert as needed; and offer Eastridge a supplemental hearing.  R. 148-49.

<u>THE SUPPLEMENTAL HEARING</u>

The ALJ held a supplemental hearing on August 20, 2009. R. 68-130.  Eastridge appeared via video conference with her counsel. Dr. Morris Alex, M.D., appeared as a medical expert.  Dr. Darrell W. Taylor, Ph.D., appeared by telephone as a vocational expert.  R. 68-71.

Eastridge testified that she still had dizziness and ringing in her ears. She testified that the dizziness was a side effect of her muscle relaxant medication.  She stated that she suffered from dizziness three to four times a day.  R. 82.  She also testified that she had pain in the middle of her neck and shoulders along with numbness and a burning feeling.  R. 82.

Eastridge testified that her hands went to sleep every night when she was in bed. She said that she would wake up in the morning and both hands would be asleep. R. 83. She testified that the problems with her hands became worse in the last six months. She also that her hands went to sleep during the day. She testified that she dropped things now. She testified that lifting a gallon of milk was painful and was the heaviest thing she could carry. R. 83. She said that she had to use two hands to lift a skillet. R. 84.

Eastridge testified that her elbows also hurt. She said that, "It felt like somebody hit me with a hammer. That's what it feels like, in both of them." R. 84. She said that she had these pains in her elbows three or four times a week. She also said that she had swelling in her left elbow. R. 84.

Eastridge testified that she was experiencing more pain in her right side in the hip area. She said the pain sometimes radiated into the back of her legs. She said that she had this pain every day. She stated that she did a lot of standing at home doing housework and the pain was "excruciating." R. 86. She said that she could sit for half an hour and stand for ten or fifteen minutes. She testified that her feet went to sleep when she stood. R. 86-87. Eastridge testified that her joints and her back ached when the weather changed. R. 87.

Eastridge testified that she had problems doing housework. She testified that her kneecap slid to one side if she rubbed her leg against the bed while making it. R. 89. She testified that she washed a sink load of dishes for ten minutes and then had to rest. R. 90. She avoided vacuuming, mopping, and sweeping because those chores hurt her back and her wrists. R. 90. She testified that she could only perform those chores for about five minutes and then would need to sit and rest. R. 90-91.

Eastridge testified that she lay down two to three hours a day. She testified that she has been lying down daily for about six months. R. 91.

Eastridge testified that she has not gone to a pain clinic. She testified that she has not received any shots for pain. She testified that she was supposed to perform physical therapy exercises on a body ball and water therapy exercises. She testified that she could not work out on the body ball by herself and she could not afford the water therapy. R. 93.

Dr. Alex then questioned Eastridge. Dr. Alex asked Eastridge if anyone ever advised her to have any nerve conduction studies on her hands. Eastridge testified no. R. 97. Dr. Alex asked if anyone advised her where to place her hands while she was sleeping. Eastridge stated that Barry told her not to put her hands above her head because of the effect of

that position on her rotator cuff.  R. 97.  Finally, Dr. Alex asked Eastridge if she ever went to vocational rehabilitation.  Eastridge said no.  R. 97-98.

Dr. Alex then testified.  Dr. Alex summarized his review of Eastridge's medical records.  R. 98-103.  Dr. Alex noted the lack of notes in the medical record concerning Eastridge's complaints about her elbows, "and that probably needs to be evaluated."  R. 99.  Dr. Alex opined that there was no evidence of spinal stenosis, and in particular, the June 2, 2006, MRI, did not show signs of spinal stenosis.  R. 100.  Based on Eastridge's medical records, Dr. Alex opined that Eastridge could perform sedentary work.  R. 103.

On examination from Eastridge's attorney, Dr. Alex explained that anterolisthesis is the movement of one vertebra on the other.  R. 106. Dr. Alex testified that in his medical experience such movement could cause pain up to a level of two to three on a scale of zero to ten. R. 106-07.  Dr. Alex testified that endplate osteophyte is an overgrowth of bone.  He testified that the development of endplate osteophytes was consistent with back pain. R. 107.

Dr. Alex testified that his diagnostic impression of Eastridge's testimony about her hands falling asleep would be carpal tunnel syndrome. R. 116.  Dr. Alex testified that some people with numbness in their hands have trouble handling, fingering, and manipulating objects.  R. 116.

Eastridge's counsel then asked, "It's your opinion she should have an EMG done, a nerve conduction test?" Dr. Alex responded yes, but that was for her physician to decide. R. 117.

Dr. Taylor, the vocational expert, then testified. The ALJ asked Dr. Taylor the following question:

> All right, if we were to assume a hypothetical individual of Ms. Eastridge's age, education, and work experience, and assume that that person cold lift 10 pounds on occasion – or frequently; and, could sit about two hours [INAUDIBLE] with normal breaks; and could – excuse me – could sit six and could – with normal breaks, and could stand at least two hours; and person should avoid pushing and pulling on the bilateral lower extremities; and never climb ladders, ropes, or scaffolds – there's some dizziness possibilities; could occasionally climb ramps, stairs, balance, stoop, and crouch, and crawl; avoid working overhead bilaterally, upper extremities; and should avoid concentrated exposure to extreme cold and heat, wetness and humidity, and full body vibration; and, should avoid working at unprotected dangerous heights, nor around unprotected dangerous machinery. And the person would be limited to one- and two-step and/or repetitive type work. I would take it this person could not perform any of the past work.

R. 124. Dr. Taylor agreed that such a person could not do Eastridge's past work. Dr Taylor opined that such a person could perform sedentary, unskilled jobs such as a hand packer and a production worker/assembler. He opined that 1,900 hand packer positions existed in Illinois and 1,000 worker/assembler positions existed in the state. Dr. Taylor opined that if the person could only sit for thirty minutes at a time, the number of

available positions would be reduced by fifty percent.  R. 125.  Dr. Taylor opined that if the person could only sit for ten to fifteen minutes at a time, then the person would not be able to work.  R. 126.  Dr. Taylor finally opined that if the person had difficulty with gripping, grasping, and holding small objects, then the person would not be able to perform the sedentary work.  R. 127.

At the end of the hearing, Eastridge's counsel asked the ALJ to confirm that Drs. Froman and Leung did not appear at the hearing.  R. 128.  The ALJ confirmed that those two doctors did not appear.  Eastridge's counsel asked the ALJ to order a nerve conduction study.  The ALJ declined.  The ALJ stated that he could not order such a test because the test involved sticking needles into the person.  R. 127.  The ALJ, however, agreed to hold the record open for thirty days to allow Eastridge to have such a test done.  R. 127-28.  The ALJ stated that he would wait to hear from Eastridge's counsel whether Eastridge would be going to get another medical test.  The ALJ stated that once everything was in, he would either make a decision or send Eastridge to a doctor for another test.  The ALJ stated that his decision would be in writing.  The hearing was then concluded.  R. 129.  Eastridge did not submit additional medical evidence after the hearing.

## THE FINAL DECISION OF THE ALJ

The ALJ entered his final decision on October 9, 2009.  R. 12-18.

The ALJ recited the procedural history of the case and summarized the

Appeals Council's decision and directive.  The ALJ incorporated into the

decision by reference the summary of the testimony in the prior hearing, as

well as the medical evidence and opinions, set forth in the August 4, 2008,

decision.  The ALJ also incorporated by reference the analysis of the

evidence set forth in the August 4, 2008, decision except to the extent

inconsistent with this decision.  R. 14.  The ALJ then discussed the

supplemental medical records and Eastridge's testimony at the

supplemental hearing.  R. 14-15.

The ALJ then discussed Dr. Alex's testimony.  The ALJ stated that

Dr. Alex found no impairment or combination of impairments that met or

equaled a Listing.  The ALJ found that Dr. Alex resolved any differences of

opinion in the interpretation of the June 2006 MRI "in favor of Dr. Chauran's

(sic) interpretation, saying that it showed nothing especially severe."  R. 15.

The ALJ summarized Dr. Alex's other opinions and then stated that

Dr. Alex concurred that Eastridge should be limited to sedentary work.

R. 16.  The ALJ then relied on Dr. Taylor's opinions to support the

conclusion at Step 5 that Eastridge could perform 2,900 jobs in the state

economy.  The ALJ in particular relied on Dr. Taylor's opinion that she

could perform half of those jobs even if she could only sit for thirty minutes at a time.  R. 16.

The ALJ relied on Dr. Alex to find no evidence of spinal stenosis. The ALJ found "no evidence of carpal tunnel syndrome, frequent elbow or other joint swelling, or chronic musculoskeletal impairment affecting anything other than the lumbosacral spine."  R. 16.

The ALJ stated,

> The claimant does not have most of the signs typically associated with chronic, severe musculoskeletal pain such as muscle atrophy, persistent or frequently recurring muscle spasms, obvious or consistently reproducible neurological deficits (motor, sensory, or reflex loss) or other signs of nerve root impingement, significantly abnormal x-rays or other diagnostic tests, recurrent positive straight leg raising or inflammatory signs (heat, redness, swelling, etc.), or bowel or bladder dysfunction.  The medical evidence establishes no inability to ambulate effectively or to perform fine and gross movements effectively on a sustained basis due to any underlying musculoskeletal impairment.  The claimant requires no cane, crutches, or other assistive device to stand or walk. There is no documented evidence of nonexertional pain seriously interfering with or diminishing the claimant's ability to concentrate.  There is no documented evidence of any chronic mental or mood disorder.
>
> The claimant's allegations of impairments, either singly or in combination, producing symptoms and limitations of sufficient severity to prevent the performance of all sustained work activity is not credible. . . .

R. 17.  Based on the opinions of Dr. Alex and Dr. Taylor, and this credibility

finding, the ALJ found that Eastridge was not disabled at Step 5.[4]

Eastridge appealed the decision.  The Appeals Council denied the

request for review on February 10, 2011.  Eastridge then brought this

action for judicial review.

## ANALYSIS

This Court reviews the ALJ's Decision to determine whether it is

supported by substantial evidence.  In making this review, the Court

considers the evidence that was before the ALJ.  Wolfe v. Shalala, 997

F.2d 321, 322 n.3 (7th Cir. 1993).  Substantial evidence is "such relevant

evidence as a reasonable mind might accept as adequate" to support the

decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  This Court

must accept the ALJ's findings if they are supported by substantial

evidence, and may not substitute its judgment for that of the ALJ.  Delgado

v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  The ALJ must articulate at least

minimally his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d

329, 333 (7th Cir. 1994).  The Court must be able to "track" the analysis to

---

[4]The ALJ noted that Eastridge would be disabled under the Social Security
Medical-Vocational Guidelines once she became 50 years of age.  See 20 C.F.R. Part
404, Subpart P, Appendix 2, Rule 201.12.  The ALJ suggested that she consider filing a
new application for Disability Benefits, as well as appealing this decision.  R. 17.

determine whether the ALJ considered all the important evidence.  Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995).

In this case, the ALJ's decision is supported by substantial evidence. The opinions of Drs. Chauhan, Alex, and Leung support the ALJ's findings at Step 3 and his RFC finding at Step 4.  The opinions of vocational experts Drs. McGowan and Taylor support the finding at Step 5 that Eastridge could perform a substantial number of jobs in the national economy.  In particular, Dr. Taylor found that Eastridge could perform 2,900 jobs that exist in Illinois, and that even if she could only sit for thirty minutes at a time, she could perform half of those jobs, or 1,450.  The Seventh Circuit has determined that 1,450 jobs meets the Commissioner's burden at Step 5 to show that the person could perform a substantial number of jobs in the national economy.  See Liskowitz v. Astrue, 559 F.3d 736, 743 (7th Cir. 2009) (1,000 is considered a significant number of jobs).

Eastridge argues that the ALJ did not comply with the Appeals Council February 4, 2009, remand order because Dr. Leung and Dr. Froman did not appear at the supplemental hearing to testify, because Dr. Alex's testimony at the medical testimony was inadequate and Dr. Alex was abrasive and uncooperative, and because the ALJ did not provide sufficient rationale for his RFC finding.

The Appeals Council reviewed the October 5, 2009, decision and denied the request for review. The Appeals Council, thus, determined that the ALJ sufficiently complied with the February 4, 2009, remand order. This Court will not disturb that finding. Furthermore, this Court does not have authority to decide whether the ALJ complied with the administrative remand from the Appeals Council. This Court has authority to decide whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g). This Court should not and will not second guess the Appeals Council on administrative procedural matters.

In addition, the Court finds nothing in the record that would preclude Dr. Alex's testimony from providing substantial evidence to support the decision of the ALJ. Eastridge criticized Dr. Alex's age and experience, but her counsel stated on the record that he reviewed Dr. Alex's resume and had no objection to him testifying as a medical expert. See Motion for Summary Judgment, at 16-17; but see R. 95-96. Any objections to Dr. Alex's qualifications are, thus, waived. Eastridge also complains that Dr. Alex was abrasive, uncooperative, and did not answer some questions. The transcript shows Eastridge's attorney was effectively cross-examining Dr. Alex about the medical opinions to which he had already testified at the hearing, and Dr. Alex was responding in a typical manner to such cross

examination.  The Court sees no basis to conclude that ALJ could not

Dr. Alex's testimony in making his determination.

The ALJ also provided a sufficient rationale for his RFC finding.  The

ALJ explained that in his first decision RFC finding was based on the

opinions of Drs. Chauhan and Leung.  <u>See</u> R. 140-41.  The ALJ

incorporated that analysis into the second decision by reference.  The ALJ

further explained that the RFC finding was supported by Dr. Alex's

opinions.  <u>See</u> R. 16.  The ALJ provided a sufficient rationale for the RFC

finding.

Eastridge next challenges the ALJ's credibility findings.  This Court

will not review the credibility determinations of the ALJ unless the

determinations lack any explanation or support in the record.  <u>Elder v.</u>

<u>Astrue</u>, 529 F.3d 408, 413-14 (7th Cir. 2008).  Eastridge complains that the

ALJ relied on Drs. Alex and Chauhan rather than Dr. Wilson and Berry.

The Court will not re-weigh the evidence.   <u>See</u> <u>Delgado v. Bowen</u>,

782 F.2d at 82 (Court may not substitute its judgment for ALJ).  In this

case, the testimony of Dr. Alex, the medical evidence from Dr. Chauhan,

and the opinions of Dr. Leung supported the ALJ's RFC finding.  That

evidence meets the standard of substantial evidence.

Eastridge also complains about the ALJ's credibility finding with

respect to Eastridge's testimony.  The ALJ, however, explained the basis

for that finding.  As quoted above, the ALJ found no objective medical evidence that typically is present when a person has debilitating pain. Eastridge argues that this quoted explanation is mere boilerplate and not a real explanation.  The Court agrees that the first decision contains remarkably similar language.  <u>See</u> R. 141-42.  The repeated use of the same language, however, begs the question.  The question is whether the ALJ provided an explanation of his credibility finding and whether the explanation is supported by the evidence.  The evidence supports the ALJ's explanation that Eastridge did not have typical signs of debilitating pain.

In addition, other evidence supports the credibility finding.  The medical opinions of Drs. Alex and Leung were inconsistent with Eastridge's testimony about her physical limitations.  Eastridge's own testimony was inconsistent.  She testified at the first hearing that she could stand for an hour and a half before her back would start hurting.  R. 36.  At the second hearing she testified that she could only stand for ten to fifteen minutes before she had to sit or lie down.  R. 86-87.  Given the medical evidence and the inconsistency in Eastridge's testimony, the Court will not disturb the ALJ's credibility findings.

Eastridge next argues that the ALJ erred by not developing the record.  Eastridge testified at the second hearing about problems with her

hands and elbows.  Dr. Alex stated that her testimony was consistent with carpal tunnel syndrome.  Eastridge had not undergone EMG or nerve conduction testing to determine whether she had carpal tunnel syndrome. Eastridge asked the ALJ to order a nerve conduction study and the ALJ declined.  The ALJ stated that he could not order the test because it involved stick needles into Eastridge.  The ALJ, however, held the record open to allow Eastridge to have tests performed and submit reports. Eastridge did not.  Eastridge argues that the ALJ erred by not ordering a study to see if Eastridge had carpal tunnel syndrome.

The ALJ has an obligation to develop the record.  Sims v. Apfel, 530 U.S. 103, 110-11 (2000).  The Court, however, gives deference to the ALJ's determination of the amount of evidence needed to decide a case. The Court will reverse if the ALJ's decision regarding additional medical examinations only if the ALJ abused his discretion.  Poyck v. Astrue, 414 Fed.Appx. 859, 861 (7th Cir. 2011); see Kendrick v. Shalala, 998 F.2d 455, 458 (7th Cir. 1993).

Eastridge was also represented by counsel.  When a claimant is represented by counsel, the Court may assume that the claimant has presented the strongest case that she could and that the ALJ adequately developed the record.  Hawkins v. Chater, 113 F.3d 1162, 1167-68 (7th Cir. 1997); Glenn v. Secretary of Health and Human Services,

814 F.2d 387, 391 (7th Cir. 1987).  Because she was represented by

counsel, Eastridge had the burden to introduce some objective evidence

that further development of the record was required.  Hawkins, 113 F.3d at

1167.

Eastridge presented no objective evidence that additional evidence

was necessary.  The only evidence was Eastridge subjective complaints

about her hands and elbows.  The medical evidence in the record showed

that Eastridge had normal grip strength in both hands and generally no

swelling or tenderness in the elbows.  Even as late as January 6, 2009,

Dr. Wilson found no tenderness in her joints and full range of motion and

equal strength in her upper extremities.  R. 823.

The ALJ also stated that he was not authorized to order a

nerve conduction study.  This appears to be correct.  The ALJ only had

the authority to order another consultative examination.  20 C.F.R.

§ 404.1527(c)(3).  The consulting physician would have then needed to

determine that a nerve conduction study was required and that such an

invasive test would not have posed a significant risk of harm to Eastridge.

20 C.F.R. § 1519m.

The ALJ, however, did not cut off Eastridge's opportunity to present

some objective evidence.  The ALJ held the record open for thirty days to

allow Eastridge to provide additional medical evidence.  When Eastridge

submitted no evidence during this thirty-day period, the ALJ could have properly concluded that Eastridge decided not to pursue her disability claim based on carpal tunnel syndrome.

Eastridge argues that she could not afford to get a nerve conduction study. Eastridge emphasizes that received her medical care through a free clinic. Eastridge was, however, able to secure an MRI of her back in 2006, an examination by a neurologist in 2007 and 2008, and additional radiological tests in 2009. The ALJ could have reasonably concluded that Eastridge's doctors could secure additional medical tests if the tests were medically necessary. Given the lack of objective evidence of carpal tunnel syndrome and the ALJ's willingness to keep the record open to give Eastridge the opportunity to present additional medical evidence, the Court finds no abuse of discretion in the ALJ's development of the record.

Eastridge finally argues that the ALJ erred in dismissing the vocational expert Dr. Taylor's testimony that she would have been unemployable if she could only sit for ten to fifteen minutes at a time or if she could not grip or manipulate small objects. The Court finds no error. Eastridge testified twice that she could sit for thirty minutes at a time. See R. 36-37, 86-87. The ALJ could, thus, properly disregard the expert's answers to Eastridge's hypothetical questions about a person who could only sit for ten to fifteen minutes at a time. The ALJ also could disregard

the answers to the hypothetical questions about the inability to grip or manipulate objects because the medical evidence showed normal grip strength. The Court finds no error in the ALJ's evaluation of the vocational experts' testimony.

WHEREFORE, Plaintiff Mary Eastridge's Brief in Support of Motion for Summary Judgment (d/e 17) is DENIED, and Defendant Commissioner of Social Security's Motion for Summary Affirmance (d/e 19) is ALLOWED. The decision of the Commissioner is affirmed. THIS CASE IS CLOSED.

ENTER: February 9, 2012

<u>        s/ Byron G. Cudmore        </u>
BYRON G. CUDMORE
UNITED STATES MAGISTRATE JUDGE